CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

JEFF MITCHELL (CABN 236225)
Chief, Criminal Division

ALETHEA SARGENT (CABN 288222)
Assistant United States Attorney

    1301 Clay Street, Suite 340S
    Oakland, California 94612
    Telephone: (510) 637-3680
    FAX: (510) 637-3724
    alethea.sargent@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 23-cr-248-2 AMO |
| Plaintiff, | **UNITED STATES' SENTENCING MEMORANDUM AS TO RYAN MONTGOMERY** |
| v. | |
| RYAN MONTGOMERY, | Hearing Date:  February 23, 2026 |
| Defendant. | Hearing Time: 2 pm |
| | Courtroom:    3, 3rd Floor |
| | Hon. Araceli Martínez-Olguín |

## I.  INTRODUCTION

On March 17, 2023, Ryan Montgomery joined his co-defendants in their planned armed takeover robbery of Heller Jewelers in San Ramon, California, resulting in the theft of $1.1 million (retail price) in jewelry and watches.  The robbery had been carefully planned and tightly choreographed, with Montgomery's co-defendants scoping out the site a week in advance, lying in wait with Montgomery in the hour before the robbery itself, transporting the inside men to the store where the robbery was executed in the space of a minute, and then fleeing with Montgomery via different routes to a meetup spot in Oakland, where they dumped two getaway cars before going to their separate ways.  Multiple participants still have never been identified.  Shell-shocked staff and customers were left traumatized,

USA SENTENCING MEMO RE MONTGOMERY       1
23-cr-248-2 AMO

and a small business owner was left with substantial costs.

To reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, and to deter future criminality, while also taking into account Montgomery's co-defendants' sentences, Montgomery's reduced role relative to his co-defendants, and his personal history, the government recommends a sentence of 24 months in prison, 3 years of supervised release, forfeiture, and restitution.

## II.    OFFENSE AND RELATED CONDUCT

On March 17, 2023, at approximately 2:45 p.m., officers with the San Ramon Police Department (SRPD) were dispatched to a takeover, armed robbery at the Heller Jewelers store located at 6000 Bollinger Canyon Road, San Ramon, California 94583 (the City Center Bishop Ranch Shopping Center). Dkt. 1, at ¶ 10. Based on witness accounts, surveillance footage, and automated license plate reader (ALPR) technology, it was quickly determined that the robbery was executed in carefully choreographed fashion by at least eleven suspects who participated in various roles during the execution of the robbery. *Id*. at ¶ 11.

A hour earlier at approximately 1:40 p.m. on or about March 17, 2023, a grey Dodge Charger, bearing California license plate 9CEN236, registered to Montgomery, had been observed on surveillance cameras in the area of the City Center Bishop Ranch shopping area. *Id.* at ¶ 43. That same Charger was then seen leaving the area of the City Center Bishop Ranch as SRPD officers arrived in the area (responding to the robbery) at 2:47 p.m. *See id.* at ¶ 43.

Just two minutes before the grey Charger's departure, a white Jeep Grand Cherokee, driven by Montgomery's co-defendant Sunia Faavesi, and an orange Dodge Charger had pulled into the valet section of the shopping center. PSR ¶ 14. Seven subjects got out of the two vehicles and walked to the entrance of Heller Jewelers wearing hooded sweatshirts, long pants, ski and surgical masks, and gloves; others stayed in the cars, ready to transport the armed robbers from the scene. *Id*. One suspect drew a handgun and pointed it at the sole security guard tasked with guarding the front entrance of Heller Jewelers. *Id*. This suspect, still pointing the handgun at the security guard's head, then grabbed the security guard and physically moved him away from the door, shoving him against a nearby wall. Dkt. 1, at ¶ 13.

The other six suspects entered Heller Jewelers.  PSR ¶ 14.  One of these six suspects drew a second handgun and pointed it at the employees and customers inside the store (approximately ten people), waving it back and forth and demanding that they get on the ground.  *Id.*  The remaining five suspects then began smashing display cases with hammers and loading items into duffle bags.  *Id*.  Surveillance footage shows both customers and staff taking cover around and behind display cases as they cowered and clung to one another during an interminable one minute, to protect and for protection.  *See* Dkt. 266-1, at Ex. 1.

As one victim wrote to the Court: "I heard loud banging" and was "not sure if it was gun fire or the showcases being pounded on. Even though the robbery lasted approximately 1 minute it seemed like an eternity, I was scared to death and shaking uncontrollably."

After almost precisely one minute of doing their work, to that point, slowly and methodically, the six suspects, moving almost in concert, suddenly all fled back out the front door.  PSR ¶ 14.  They had with them over 75 necklaces, rings, and watches, valued at $1,114,515 sale price and $703,205.30 replacement cost.  *See* Dkt. 266-1, at pp. 7-11.

The robbers fled towards the direction of the southern portion of the parking lot, where Montgomery's co-defendants, including co-defendant Faavesi, waited in both the orange and white getaway cars and other lookout cars.  PSR ¶ 15.  Those cars fled.  *Id*.  Both the orange and white getaway cars were located by law enforcement abandoned later in the day in the area of 77th Avenue in Oakland.  PSR ¶ 16.

Like Montgomery, Montgomery's co-defendants appear to have been in the general area for approximately an hour prior to the robbery, *see* Dkt. 1 ¶¶ 55, 68, 76, 80, 81, & 83.  At 2:28 p.m., Tupou called Tonga, who in turn connected him with Faavesi, Vehikite, and an unknown number in a multi-way phone call that lasted until 2:46 p.m., or exactly one minute after the robbery began—meaning that the call began 16 minutes before the robbery and the conclusion of the call coincided precisely with the conclusion of the robbery.  *See* Dkt. 1 ¶ 50-52; *see also* PSR ¶ 13.  That call served to connect all four of the identified involved cars and perhaps an individual on the inside as well.  *See id.*  It allowed for the careful choreography of movement seen in surveillance both inside and outside the store.  *See id*.  Montomgery was not on that call.  Still, Montgomery's grey Charger, like the other vehicles, fled the

scene at 2:47 p.m.

Also allowing for the careful choreography was the fact that this was not the first time Montgomery's co-defendants had been to the City Center Bishop Ranch Shopping Center. Exactly one week prior, phone location data and ALPR hits place co-defendants John Tupou, Sunia Faavesi, Paul Christopher Tonga, and Kyle Vehikite at the same location and in similar cars. *See* PSR ¶ 12. On that day a week prior to the robbery, the group fled upon the arrival of law enforcement. *Id.* It is unknown if they had originally intended to perpetrate the robbery that day or were merely gaining useful information for the next week's heist; the latter is likely, as their time spent in the area on March 10 was much briefer than on March 17. *Compare* Dkt. 1 ¶ 65 *with* ¶¶ 55, 68, 76, 80, 81, & 83. As with the call, Montgomery did not participate that day. *See* Dkt. 1 ¶ 67.

As noted, following the robbery, all four involved cars then fled at once, rapidly. PSR ¶ 15. They traveled various routes to a specific area of Oakland, where they abandoned two of the cars, including the Jeep Faavesi had driven, watch pillows, and tools. PSR ¶ 16. They divided the stolen goods among themselves and their other conspirators. PSR ¶ 19. Later in the evening, at approximately 5:30 p.m. on March 17, 2023, Montgomery, Tonga, and Vehikite reconvened near a location associated with Vehikite. PSR ¶ 18. Montgomery transported Tonga to this meeting. *Id.*

On July 26, 2023, agents executed search and arrest warrants related to the robbery. PSR ¶ 17. Two of the Rolexes were recovered that day at Vehikite's residence. The search of Montgomery's residence did not reveal any items directly connected to the robbery. However, he did possess large amounts of jewelry and two Rolexes, one stolen in the course of a separate robbery, PSR ¶ 20, indicating that Montgomery may have a knowledge of fine jewelry that the others valued. In addition to the watches and jewelry, law enforcement located a Glock 17 9mm semiautomatic firearm, serial number BDBD838, with a high-capacity magazine loaded with eight 9mm rounds, as well as assorted other ammunition. *Id.* The firearm had been modified to shoot automatically more than one shot by a single function of the trigger—in other words, to operate as a machinegun. *Id.* Montgomery has a felony conviction (grand theft, PC 487(a)) out of Santa Clara.

## III.    SENTENCING GUIDELINES CALCULATIONS

The government agrees with the United States Probation Department's Sentencing Guidelines

calculation. PSR at ¶¶ 30-51.  Specifically, the government agrees that the defendant's Base Offense Level of Count Group 1 is 20, *id*. at ¶ 30; that 6 levels should be added for the use of firearms during the course of the robbery, *id*. at ¶ 31; that 3 levels should be added for a loss of over $500,000, id. at ¶ 32; and that 6 levels should be deducted for the defendant's being considered an accessory after the fact, *id*. at ¶ 33.  The government further agrees that the defendant's Base Offense Level of Count Group 2 is 20 and that no adjustments apply, *id*. at ¶¶ 38 & 43.  After adding a 2-level increase for grouping and deducting 3 levels for acceptance of responsibility, the combined offense level is 22.  *Id.* at ¶¶ 45-51.

The government also agrees with Probation's finding that the defendant has 3 Criminal History Points, placing him in Criminal History Category II.  *Id*. at ¶¶ 59-60.  An offense level of 22 with a Criminal History Category II yields an advisory sentencing range of 46 to 57 months of imprisonment. PSR ¶ 93.

## IV.    APPLICABLE LAW

The Court should impose a sentence sufficient, but not greater than necessary, to reflect the purposes of sentencing that Congress identified in 18 U.S.C. § 3553(a)(2).  *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008).  The Court should begin the process of determining an appropriate sentence by calculating the correct sentencing range under the Guidelines.  *Id*.  After determining the appropriate Guidelines calculation, the Court should then evaluate the sentence for substantive reasonableness in light of the factors set out in Section 3553(a).  *Carty*, 520 F.3d at 991–93.

Under 18 U.S.C. § 3553(a), in arriving at the appropriate sentence for the defendant, the Court should consider these factors applicable to this case, among others:

1) the nature and circumstances of the offense and the history and characteristics of the defendant;

2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

3) the need for the sentence imposed to afford adequate deterrence to criminal conduct;

4) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct;

5) the need to provide restitution to any victims of the offense.

USA SENTENCING MEMO RE MONTGOMERY        5
23-cr-248-2 AMO

## V.    RECOMMENDATION

Based upon a consideration of the Sentencing Guidelines and the factors set forth in 18 U.S.C. § 3553(a), the government respectfully recommends that the defendant be sentenced to 24 months in prison, three years of supervised release, forfeiture, and full restitution in the amount of $986,041.24 (the replacement cost of the stolen items, as set forth in Dkt. 266-1, at pp. 7-11, plus approximately $250,000, the cost of repairs to the store, as described in the owner's victim impact statement and the co-defendants restitution stipulation, *see* Dkt. 336, at ¶ 1), to be borne joint and several with Montgomery's co-defendants. Such a sentence would be sufficient, but not greater than necessary, based on the nature of the offense and the history and characteristics of the defendant.

In this case, Montgomery's co-defendants planned and perpetrated a show of callous violence and intimidation that terrorized civilians solely for their own personal gain. It wasn't a last-minute or thrown-together plan. They practiced it a week earlier. Then, on the day of the robbery, they arrived on the scene an hour ahead of time and laid in wait. They followed along on a multi-way, coordinating phone call as seven masked, gun- and hammer-wielding co-conspirators poured out of two cars driven by his co-conspirators and into a store full of innocent employees and customers. For their crimes, this Court sentenced two of them to 36 months' imprisonment and two of them to 42 months' imprisonment, with the difference primarily accounted for by the defendants' relative criminal histories.

Those sentences were in part a result of a plea agreement that credited those defendants with a 3-level downward departure for rapid acceptance of responsibility. Unlike his co-defendants, Montgomery did not avail himself of that deal. The government understands that he made this decision based on his feeling that he bears a lesser degree of responsibility for the crimes than his co-defendants.

The evidence does not negate his view. To be sure, the evidence indicates that Montgomery was present during the full hour that his co-defendants waited prior to the robbery on March 17; that he met with them following the robbery at the location of the dumped vehicles; and that he met with them later in the evening, even transporting co-defendant Tonga to another co-defendant's home. At the same time, the evidence does not indicate he was present at the casing event that took place a week earlier. And he did not participate in the multi-way phone call during the robbery. Indeed, he appears to have had little or no contact with any co-defendant other than Vehikite either before or after the robbery. And

while Montgomery has been charged with and admitted to being a felon in possession of a firearm, so too could several of his co-defendants been charged with the same crime following the search warrant executions.

It is consequently the government's view that, taking into account the need to avoid unwarranted sentencing disparities, a 24-month sentence for Montgomery reasonably reflects his lesser culpability than his co-defendants, who received 36- and 42-month sentences. They planned; they perpetrated. Montgomery, to be sure, assisted, but it is reasonable that he receive the lesser sentence of 24 months, which is sufficient but not greater than necessary to effectuate the purposes of sentencing, given his diminished role in the crime. A consideration of the other § 3553 factors does not alter this analysis.

While the government understands that the parties have agreed to defer restitution, the government notes that its position is and will be that Montgomery should bear the same restitutionary burden as his co-defendants. This position is consistent with the Ninth Circuit's holding in *United States v. Ward*, in which a defendant was initially charged with violating 18 U.S.C. §§ 2 & 659 but ultimately pled to a superseding information charging him with violating 18 U.S.C. § 3. The Ninth Circuit held that Ward could be held accountable for restitution because, in the first place, "Ward's actions in carrying out the crime of which he was convicted, being an accessory after the fact, were part of a chain of events which caused harm to [the victim]," and, in the second place, "[t]he circumstance that the prosecutor decided to permit Ward to plead to being an accessory after the fact, rather than to the crimes of theft or possession of stolen property, cannot be utilized to thwart the compensatory objectives of the VWPA." 862 F.2d 875, 1988 WL 126265 (9th Cir. 1988).

The recommended sentence accounts for the defendant's criminal history, the seriousness of his conduct in this case, the characteristics of the defendant, and the defendant's life history, and it is not more than necessary.

## VI.    CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court impose a sentence of 24 months of imprisonment, followed by a 36-month term of supervised release. In addition, the government requests the defendant be sentenced to forfeiture and restitution in an amount of $986,041.24, which amount will be determined at a subsequent restitution hearing.

DATED: 2/17/26

CRAIG H. MISSAKIAN
United States Attorney


_____*/s/*_____
ALETHEA SARGENT
Assistant United States Attorney